## Commonwealth v. Raymond.

*Game law—Killing deer—Removal of entrails—Act of May 24, 1923, sect. 720.*

1. A person may legally kill a doe deer if he finds it in his wheatfield doing damage to his crops.

2. The Act of May 24, 1923, P. L. 359, does not specify within what time the entrails of a deer are to be removed after it has been killed while damaging crops, but it must be done within a reasonable time, to the end that the meat may be fit for food.

3. A person who has legally shot a deer cannot be convicted of not removing the entrails, where it appears that he made no attempt to conceal the killing, but immediately took steps to inform the game warden of his act, so that the latter might inform him how to act, and that the warden had possession of the deer two hours after it was killed.

Appeal from summary conviction. Q. S. Union Co., Jan. Sess., 1925.

*L. F. Lybarger* and *Curtis C. Lesher*, District Attorney, for Commonwealth. *A. W. Johnson*, for defendant.

POTTER, P. J., Feb. 12, 1925.—This is an appeal from a summary conviction of the defendant, the proceedings having been had before C. M. Steese, Esq., a justice of the peace in and for the Borough of Mifflinburg, Union County, Pennsylvania.

The judges of this court have personal knowledge of most of the facts incident to this case, and the balance are furnished by the evidence produced upon the hearing of the appeal.

The defendant resides upon a farm in Hartley Township, Union County, cultivates the land, and depends upon its production for his subsistence. For the past few years his growing crops have been much damaged by the depredations of wild deer, of which he has made complaint, both to the game warden as well as to the authorities at Harrisburg. These depredations continued till on May 19, 1924, in the morning, a few minutes before six o'clock, when he again saw five or six deer in his wheatfield eating off the young growing wheat, he shot one of them, killing it. He immediately went to a small store nearby, where he could have access to a telephone, he having none in his dwelling and this being the nearest one to him, to call the game warden, to inform him of the killing of the deer and ask for instructions. He called

the game warden, Mr. Miles Reeder, but could get no response, the testimony developing the fact that Reeder had not yet arisen, that he heard the phone call while in bed, but when he dressed himself and went to the phone, the party who called him had left. Upon leaving the store the defendant met a Mr. Osenbaugh, who is a game protector, and told him he had killed a deer. He then went to a neighbor to borrow a cornplanter, expecting to get back when the game warden should arrive, Osenbaugh in the meantime calling Reeder and informing him of the killing of the deer. Reeder arrived upon the scene at about eight o'clock A. M. He and Osenbaugh got the deer, placed it on the running-board of his automobile, and, upon gaining the public road, met Raymond. Reeder asked him if he had shot the deer, and Raymond frankly said he had, whereupon Reeder told him he would have to arrest him.

He was arrested, tried before the said justice, found guilty of a violation of the game laws, and was fined $100 and the costs, from which action Raymond took an appeal and the case was brought to court. On the hearing, a motion was made to quash the case because the testimony before the justice failed to show that the alleged offence was committed in Union County, showing no jurisdiction, and because the sentence of the justice was defective. We considered these two defects fatal to the proceedings and sustained the motion. We did not hear any testimony and did not go into the merits of the case, so that our reasons for quashing the case were purely and technically matters of law.

The defendant was a second time arrested for the same offence, was again convicted by the same justice, and an appeal again taken, which was fully heard by the court on the merits of the case.

It is admitted by the Commonwealth that the deer was doing damage to the growing crops of the defendant when he killed it, and that he had a legal right to shoot it, it having been a doe. The only complaint before us is that the defendant did not remove the entrails and hang up and properly care for the carcass for delivery to some charitable institution, as is provided for by the Act of May 24, 1923, § 720, P. L. 359. We quite agree with this admission, and, as a question of law, we find that if this doe was doing damage to the crops of the defendant, he had a legal right to kill her. The act does not specify within what time the entrails are to be removed, but it must be done within a reasonable time, to the end that the meat may be fit for food.

As to the question of his guilt in not removing the entrails, hanging up and properly caring for the carcass, before we can sustain the conviction of the justice, we must carefully consider all the conditions and surrounding circumstances.

And, first, as to an intent to do wrong. This defendant made no attempt to conceal his killing of this doe. Immediately upon shooting it he took steps to inform the game warden of his act. Had he tried to conceal the killing of it, then we might infer a guilty intent on his part, and, happening as it did, the Commonwealth could not well have proven the act upon him. But his frankness in the matter, his immediately taking steps to inform the game warden of the killing of the doe, in our judgment, relieves him of the charge of a guilty intent. He testifies that he did not know how to remove the entrails, that he had never removed them from any animal and that he wanted to await the arrival of the game warden to show him how to do it, then he would perform this act, and then go on with his farm work. This seems to us quite plausible. Never having performed an act of this kind, we can readily believe he wanted some instructions, and we are inclined to accept his statements made in this behalf. Who can, then, say there was a guilty intent upon his

part? And before a criminal conviction can be had, a guilty criminal intent must be gathered from some source. This is one of the important prerequisites to convict of crime, and it is horn-book law that needs no further discussion.

This doe was killed a few minutes before six o'clock in the morning. It was in the custody of the game warden by about eight o'clock in the same morning. It was by him buried as not being fit for food, having lain on a May morning for about two hours. Testimony was produced tending to show, on the part of the Commonwealth, that the doe was not fit for food, and we have evidence on the part of the defence tending to show that it was. As a matter of fact, and from our own experience in life, we are led to accept the theory of the defence, and we believe the carcass of this doe, if it was not with foal, to have been fit for food. Testimony was developed as to an enlarged condition of it, the Commonwealth claiming this to be caused by bloating, and the defence claiming it to have been caused by the doe being with foal, the date on which it was killed having been around or about the season for the delivery of fawn by female deer. The doe was not opened, so we have no direct proof on this point, which is not really material to this case; but as it has been injected into it, taking into consideration the uncontradicted fact that the body of the doe had lain for only about two hours after the killing, we are rather inclined to the belief that the doe was with foal, rather than to believe it had bloated. In that time *rigor mortis* could not have set in. We very much doubt if in that time the carcass was thoroughly cold, without which *rigor mortis* could not have developed.

Another familiar principle of law which must be observed in the trial of all criminal cases, whether before a justice, the court or a jury, is that the defendant is at all times entitled to the benefit of the doubt, and if a reasonable doubt exists in any instance, the defendant is entitled to it and must be acquitted. In this case, from all the testimony produced, we are very free to say that we have a very grave doubt as to this man's guilt. In fact, we are drawn to the conclusion, not chiefly from what he says, but from the surrounding circumstances, that he meant no offence whatever. His actions show he did not, and from them we must in this case largely judge as to his guilty intent. His frankness and his promptness in taking steps to inform the game warden of his act, in our judgment, negatives it, without which no conviction could be had.

We are here to enforce the law, to punish the guilty, but we also have an abiding faith in the time-honored maxim that justice must at all times be tempered with mercy. Criminal courts were created to punish flagrant offenders and to protect society from the lawless, but in so doing we should always bear in mind that by an act of mercy, by reaching out a helping hand to the first offender, many men and women in the first stages of a downward career may be redeemed and made ornaments of morality and good law-abiding citizens in the community and in the nation.

That is our feeling in this case. We do not believe that John Raymond intended any violation of the law in the act complained of, and in our disposition of this case we are endeavoring to look charitably upon his frailties, if any such exist, and, instead of branding him as a criminal, we are inclined to reach out to him the sympathetic hand of the court and to assist him to again face his neighbors and associates as a free man, untrammeled by the stigma of a court conviction.

On the other hand, we do not want our disposition of this case to be taken or in any wise understood as an indication that we close our eyes to violations

of the law. Far from it. We propose to administer the law from our viewpoint kindly and charitably, but firmly; and when open and flagrant violations of the law come before us in our judicial capacity, the persons who so violate them can expect to have meted out to them as their just dues deserve.

The three judges of this court are unanimous in this disposition of this case.

And now, to wit, Feb. 12, 1925, the appeal is sustained, the conviction of the justice is reversed, and it is directed that the costs of these proceedings be paid by the County of Union.

From Charles P. Ulrich, Selinsgrove, Pa.